IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

SADRICK DONALDSON,               )
                                 )      Civil Action No. 04-257E
        Plaintiff,               )
                                 )      Judge McLaughlin
        v.                       )      Magistrate Judge Baxter
                                 )
UNITED STATES OF AMERICA,        )      ELECTRONICALLY FILED
                                 )
        Defendant.               )

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS,
OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

AND NOW, comes Defendant, United States of America, by its
attorneys, Mary Beth Buchanan, United States Attorney for the
Western District of Pennsylvania, and Paul E. Skirtich, Assistant
United States Attorney for said district, and, pursuant to Rules
12(b)(1) and 56 of the Federal Rules of Civil Procedure, files
the following Memorandum of Law in Support of Defendant's Motion
to Dismiss or, Alternatively, for Summary Judgment.  In support
of its Motion, Defendant respectfully avers as follows:

## I.  PLAINTIFF'S CLAIMS

Plaintiff, a federal inmate, files this action sounding in
tort against the United States of America and generally claims
that prison officials were negligent in failing to prevent an
assault against him by another inmate.  (Plaintiff's Complaint,
hereinafter "Complaint," para. 1, 26).

Plaintiff claims that while he was an inmate at FCI-McKean,
he was harassed to engage in sexual conduct in November, 2002, by
inmate Eric Drayton (Drayton) and other unnamed inmates.

(Complaint, para. 4).  When Plaintiff resisted, Drayton and the others threatened him.  (Complaint, para. 4).  On November 12, 2002, Plaintiff sought help from the unit correctional officer.  That day, Plaintiff repeated the threat to a Lieutenant who asked for and learned that Eric Drayton had pressured Plaintiff for sex.  (Complaint, para. 5, 6).  After Plaintiff named Drayton, Plaintiff was placed in the Segregated Housing Unit (SHU) in protective custody pending further investigation.  (Complaint, para. 6).

After the investigation was completed, on December 19, 2002, Plaintiff was ordered back to the general population, but he refused for his perceived fear of his life; his refusal resulted in the issuance of an incident report by Officer Donald Nero. (Complaint, para. 15).  Prison officials upheld the issuance of this report in administrative proceedings, placed him in Disciplinary Segregation, and took away "good time" credit. (Complaint, para. 17).

On February 12, 2003, prison personnel again ordered Plaintiff to return to the general population; this time, Plaintiff complied.  (Complaint, para. 19).

On August 29, 2003, in the Education Department, Drayton threw a hot liquid "chemical" substance at Plaintiff, causing "chemical" burns to his hair, face, shoulders, and eyes. (Complaint, para. 24, 25).  Plaintiff asks for twenty-five

2

million dollars ($25,000,000.00) in damages, for an injunction for any and all medical procedures needed to undo the damage to his face, head, and eye and to further prevent Drayton from causing him any harm. (Complaint, para. 32, 33, 34).

Plaintiff's allegations arise from an incident in which Bureau of Prisons (BOP) staff investigated the allegations and utilized its discretion that Plaintiff could safely return to the general population.

As discussed below, this Court lacks subject matter jurisdiction over this lawsuit, as the actions and decisions of the BOP staff fall within the purview of the Discretionary Function Exception, 28 U.S.C. § 2680(a) to the Federal Tort Claims Act, and the United States has not waived its sovereign immunity for such actions. Accordingly, Plaintiff's Complaint must be dismissed or, in the alternative, the Court must grant summary judgment for the United States.

## II. <u>STATEMENT OF FACTS</u>

On November 9, 2001, Sadrick L. Donaldson arrived at FCI-McKean (McKean). (Deposition of Sadrick L. Donaldson, dated May 5, 2005, hereinafter "Donaldson", 7, attached hereto as Exhibit 1). Inmate Eric Drayton arrived at McKean sometime after. (Donaldson, 8). The Plaintiff first met Drayton at FCI-Allenwood prior to being transferred to McKean, an institution for lower-level classification inmates. (Donaldson, 12, 14, 20).

3

Though he had one verbal altercation with Drayton, Donaldson had a "friendly" relationship with Drayton at Allenwood. (Donaldson, 17). The altercation was never reported to prison officials at Allenwood (Donaldson, 18); likewise, the Plaintiff never told prison officials that he had to get away from Drayton. (Donaldson, 21).

At McKean, Donaldson was housed in Building B while Drayton was housed in Building D. (Donaldson, 21). Between one and four months after arriving at McKean, Donaldson and Drayton engaged in a second altercation; this time, Drayton grabbed Donaldson's arm and "cussed" at him but did not hurt him. (Donaldson 22, 23, 25, 41). In this second argument, Drayton wanted to have sex with Donaldson and wanted to limit the Plaintiff's contacts with other inmates. (Donaldson, 23, 24, 25). Donaldson admitted that prior to this second incident, he had consensual sex with Drayton two or three times at McKean. (Donaldson, 23, 24, 52). Donaldson failed to tell prison officials at McKean that he had sex with Drayton. (Donaldson, 24).

On November 12, 2002, in the early morning hours, Donaldson asked for protective custody. After telling the Operations Lieutenant that Eric Drayton was pressuring him for a relationship, prison officials placed Plaintiff into the SHU pending further investigation. (See Memo of Charles Kindervater, dated December 2, 2002, para. 2, attached hereto as Exhibit 2; Donaldson, 26, 27, 28, 31).

Later that afternoon, Unit Manager Kindervater and Counselor Gary Buck interviewed the Plaintiff at the SHU.  During the interview, Donaldson disclosed that:  (1) Drayton was pressuring Donaldson for a relationship; (2) Donaldson and Drayton were involved in a relationship at USP-Allenwood, which Drayton wanted to continue but Donaldson did not; (3) that Drayton had been coming to Donaldson's cell in the evenings and pressuring him; (4) about one month ago, three other unnamed inmates approached Donaldson on the compound for sex but did not assault him when he refused; (5) Drayton tried to limit Donaldson's interactions with other inmates and became defensive of Donaldson; and, (6) Donaldson did not believe that Drayton would hurt him, but Drayton might hurt someone else.  (Ex. 2; Donaldson 29, 71, 73, 76, 77).

Subsequent to this interview, Mr. Kindervater interviewed Inmate Drayton.  Drayton stated that he would never do anything to harm Donaldson; in fact, Drayton wanted to move in with him. (Ex. 2; Donaldson, 32).

Mr. Kindervater also interviewed Donaldson's cellmate and learned that Drayton had argued with Donaldson on November 11, 2002, but no physical confrontation occurred.  Mr. Kindervater concluded, however, that no credible evidence of a threat to Donaldson's safety existed, and that Donaldson should be returned to the general population.  Additionally, Mr. Kindervater requested that prison personnel more closely observe Donaldson and to prevent unauthorized entries into Building B.  Finally,

Mr. Kindervater recommended a picture of Drayton be posted in the Unit Office to help prevent his unauthorized entry; subsequently, the picture was posted by unit staff in Building B.  (Ex. 2; Donaldson, 74).

SIS Lieutenant Mark Chiodo, Captain Donald Reich, and Associate Warden for Programs Cindy Billisits reviewed the memorandum and agreed with all of the recommendations.  (See Ex. 2).  As a result, prison officials determined that Inmate Donaldson should be returned to the general population since no credible evidence of harm existed.  The officials added some precautionary measures to be taken to continue to ensure Donaldson's safety.  (Ex. 2).

On December 19, 2002, Officer Donald Nero ordered Plaintiff to return to the general population.  Inmate Donaldson refused, and Officer Nero had no choice but to file an incident report. (Complaint, para. 15; See Ex. 3, Incident Report of December 19, 2002, hereinafter referred to as "Ex. 3,", box 11).

On December 20, 2002, Plaintiff repeated his refusal to Unit Disciplinary Committee (UDC) Members Gary Buck and Tim Holt because of the pressure "DC inmates" were placing on him for sex. (Ex. 3, box 17).  Plaintiff did not request the attendance of any witnesses at this hearing.  (Ex. 3, box 25).  The UDC recommended to the Disciplinary Hearing Officer (DHO) a minimum sanction of 15 days in the SHU and loss of 7 days "good conduct time."  (Ex. 3, box 20).

On January 29, 2003, DHO James Linden held a one-on-one Disciplinary Hearing with Plaintiff. Again, Plaintiff failed to request witnesses to attend on his behalf. (Ex. 4, Discipline Hearing Officer Report, dated January 29, 2003, hereinafter referred to as "Exhibit 4", Section [C][1]). Plaintiff admitted refusing the order but stated a different justification:

> ". . . but I didn't know my investigation was completed. I was a P/C, and I checked in. I talked to one of the SIS Lieutenants on I believe a Wednesday. He told me he was going to see me that Friday. The next day, Officer Nero told me I had to go back to the compound, but the SIS told me he was going to see me on Friday. The UDC saw me on Friday. I told them the SIS told me he would see me on Friday. The UDC told me the SIS told them the investigation was completed. I told the UDC I was refusing to go back to the compound because the SIS told me he was coming back to see me. That's about it. They said the investigation was over with, and that was it, but they didn't tell me it was over with until after I got the 'shot' [incident report]." (Ex. 4, III[B]).

In painstaking detail, Mr. Linden recounted the history of this incident from the date it was reported (11-12-02) to the present (1-29-03) and concluded that Donaldson's defense was unfounded. As such, he sanctioned Donaldson ten (10) days "good conduct time." (Ex. 4, Sections V and VI).

On February 12, 2003, prison personnel again ordered Plaintiff from the SHU to the general population; this time, he complied. (Donaldson, 36, 50).

7

Prior to August 29, 2003, Eric Drayton never physically harmed Donaldson.  (Donaldson, 41).

In 2003, Plaintiff took GED classes with ten to twenty (10-20) other inmates for two (2) hours during the afternoons, Monday through Friday, at the Education Department, McKean.  (Donaldson, 42, 43, 44, 45).  On August 29, 2003, Donaldson entered the classroom and reviewed his assignment.  Drayton had visited with other inmates in this classroom on at least three (3) prior occasions but had never interacted with or caused any incidents with Donaldson in this setting.  (Donaldson, 49, 50, 51, 82, 83, 84).  On this date, Drayton apparently was in the area near the classrooms and the "leisure" library when he walked into the classroom and threw a hot mixture of pepper and baby oil in the face of Donaldson.  No officials could have prevented the assault; all staff who were present rushed to Donaldson and gave him immediate treatment.  (Donaldson, 57).  Plaintiff suffered injuries to his eyes, face, hair, and shoulders.  (Donaldson, 56, 57).  Prison staff immediately flushed Donaldson's face with water, took him to the prison medical unit for further treatment, and then transported him to Bradford Regional Medical Center for treatment and an examination by an ophthalmologist.  (Donaldson 57, 58, 59).

### III.  **ARGUMENT**

A.  <u>The Discretionary Function Exception Is a Threshold Inquiry</u>.

Whether or not the discretionary function exception applies to given facts is a threshold issue and analysis of the exception must precede any negligence analysis.  <u>Miller v. United States</u>, 710 F.2d 656, 662 (10th Cir. 1983)(citations of cert denied omitted).

B.  <u>Standard of Review for Rule 12(b)(1) Motion to Dismiss</u>

Under Federal Rule of Civil Procedure 12(b)(1) a movant may make a factual challenge to subject matter jurisdiction. <u>Patsakis v. Greek Orthodox Archdiocese of America</u>, 339 F. Supp.2d 689, 692 (W.D. Pa. 2004).  This type of motion challenges the court's power to hear the case.  <u>Id.</u>  In deciding a factual challenge, the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. <u>Id.</u> (citing <u>Mortensen v. First Fed. Sav. & Loan Ass'n</u>, 549 F.2d 884 (3d Cir. 1977).  "In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." <u>Id.</u> Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.  <u>Id.</u>

C.  <u>Standard of Review for Rule 12(b)(6) Motion to Dismiss</u>

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is the appropriate method to challenge the legal sufficiency of claims in a complaint.  Fed. R. Civ. P. 12(b)(6); <u>Raines v. Haverford College</u>, 849 F. Supp. 1009, 1010 (E.D. Pa. 1994).  Although courts reviewing Rule 12(b)(6) motions generally consider only the allegations in the complaint, courts are also free to examine any exhibits attached thereto, other undisputed documents relied on by the plaintiff, other items appearing in the record of the case, and matters of public record.  <u>Raines</u>, 849 F. Supp. at 1010; <u>see also</u> <u>Oshiver v. Levin, Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); <u>Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993).  Indeed, if a court could not consider such documents, "`a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which [he] relied.'"  <u>Interfaith Community Org. v. AlliedSignal, Inc.</u>, 928 F. Supp. 1339, 1345 (D.N.J. 1996)(quoting <u>Dykes v. Southeastern Pa. Trans. Auth.</u>, 68 F.3d 1564, 1567 n.3 (3d Cir. 1995)).

While courts considering motions to dismiss have a limited role, courts should grant such motions where it is clear that no relief could be granted under any set of facts that are consistent with the allegations of a complaint.  <u>Interfaith</u>

Community Org., 928 F. Supp. at 1346.  The issue is not whether
the plaintiff will ultimately prevail but whether the plaintiff
has any chance of doing so.  Id.; Hishon v. King & Spalding, 467
U.S. 69, 73 (1984).

When making this determination, courts "must accept as true
all of the matters pleaded and all reasonable inferences that can
be drawn therefrom, construing them in the light most favorable
to the non-moving party."  Raines, 849 F. Supp. at 1010.
Nevertheless, legal conclusions made in the guise of factual
allegations should not be given any presumption of truthfulness.
Interfaith Community Org., 928 F. Supp. at 1346.

D.  Standard of Review for Summary Judgment

Summary judgment is appropriate when there is "no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a mater of law."  Fed. R. Civ. P.
56(c).  An issue is "genuine" only if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);
Equimark Comm. Fin. Co. v. C.I.T. Fin. Serv. Corp., 812 F.2d 141,
144 (3d Cir. 1987).  If evidence is "merely colorable" or "not
significantly probative," summary judgment may be granted.
Anderson, 477 U.S. at 249-50; Equimark, 812 F.2d at 144.  That
is, "where the record, taken as a whole could not lead a rational
trier of fact to find for the nonmoving party," summary judgment

is proper. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 599 (1986); <u>see also</u> <u>Hankins v. Temple Univ.</u>, 829 F.2d 437, 440 (3d Cir. 1987).

The Third Circuit has clarified that district courts should not view summary judgment motions as "a disfavored procedural shortcut," but as "the first opportunity to dispose of meritless cases." <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1362 (3d Cir. 1992). Accordingly, a district court is no longer required to "turn a blind eye" to the weight of the evidence. <u>Id.</u> at 1363. Rather, to survive summary judgement, the non-moving party must actually come forward with "<u>affirmative evidence</u> in order to defeat a properly supported motion for summary judgment." <u>Anderson</u>, 477 U.S. at 257 (emphasis added).

In short, mere conjecture or speculation by the party resisting summary judgment cannot provide a basis upon which to deny the motion. <u>Quarles v. GMC (Motors Holding Div.)</u>, 758 F.2d 839, 840 (2d Cir. 1985).

    E.  <u>The Court Does Not Have Subject Matter Jurisdiction, as Decisions Made by Prison Officials Regarding Prison Safety Fall Within the Discretionary Function Exception to the Federal Tort Claims Act</u>.

The law is well-settled that the United States cannot be sued without a waiver of its sovereign immunity. <u>United States v. Orleans</u>, 425 U.S. 807, 814 (1976). The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 <u>et.</u> <u>seq.</u>, waives immunity for certain torts committed by federal employees. There are,

however, exceptions to this broad waiver of sovereign immunity.
Specifically, the Discretionary Function Exception, 28 U.S.C.
§ 2680(a), states that the FTCA does not apply to "any
claim . . . based upon the exercise or performance or the failure
to exercise or perform a discretionary function or duty on the
part of a federal agency or an employee of the Government . . ."
When claims fall within the discretionary function exception, the
United States cannot be held liable, as it has not waived its
sovereign immunity for such claims, and the courts lack subject
matter jurisdiction over the claims.  Montez v. U.S., 359 F.3d
392, 395 (6th Cir. 2004); Alfrey v. U.S., 276 F.3d 557, 561 (9th
Cir. 2002).

     The United States Supreme Court has formulated a two-pronged
test in determining whether a governmental act falls within the
discretionary function exception.  The first prong of the test
asks whether the act in question involved an element of judgment
or choice by the acting employee.  Berkovitz v. United States,
486 U.S. 531, 536-37 (1988); United States v. Gaubert, 499 U.S.
315, 322-23 (1991).  "The requirement of judgment or choice is
not satisfied if a federal statute, regulation, or policy
specifically prescribes a course of action for an employee to
follow, because the employee has no rightful option but to adhere
to the directive."  Gaubert, 499 U.S. at 322.  If the employee's
conduct cannot appropriately be the product of judgment or
choice, then there is no discretion and the discretionary

function exception does not apply. <u>Berkovitz</u>, 486 U.S. at 536. If, however, there is no statute, regulation or policy that specifically prescribes a course of action, and the employee's conduct is appropriately the product of judgment or choice, then the first prong of the test is satisfied.

If the first prong of the test is met, and the challenged conduct does involve judgment or choice, then the second prong of the test seeks to determine whether the judgment or choice is of the kind that the discretionary function exception was designed to shield. <u>Berkovitz</u>, 486 U.S. at 536; <u>Gaubert</u>, 499 U.S. at 322-23. In making this determination, the Supreme Court has offered the following instruction:

> The basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy . . .
>
> The [discretionary function] exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy . . .
> In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.

<u>Berkovitz</u>, 486 U.S. at 536-37. Accordingly, to determine whether the second prong of the test has been met, Courts must determine whether the discretionary action in question was based and/or grounded in public policy.

14

While the United States willingly admits that it has a duty to protect inmates, the manner in which it does so is shielded by the discretionary function exception.  Unequivocally, decisions regarding prison safety are left solely to BOP staff.  There are broadly worded statutes for prison staff which concern the safety of inmates, but none which provide specific guidance to prison officials on how to accomplish it.  For instance, 18 U.S.C. § 4042(a), which governs the duties of the Bureau of Prisons, states in part:

> The Bureau of Prisons, under the direction of the Attorney General, shall - (1) have charge of the management and regulation of all Federal penal and correctional institutions; (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States . . .

At 28 C.F.R. § 541.10(a), it is written:

> "So that inmates may live in a safe and orderly environment, it is necessary for institution authorities to impose discipline on those inmates whose behavior is not in compliance with Bureau of Prison rules."

Additionally, at 28 C.F.R. § 541.14(a), it is written:

> "When a staff member witnesses or has a reasonable belief that a violation of Bureau regulations has been committed by an inmate, and when staff considers informal resolution of the incident inappropriate or unsuccessful, staff shall prepare an incident report and promptly forward it to the appropriate Lieutenant."

An incident can fall within several categories of misconduct, but those at the top end of the scale mandate an investigation.  28 C.F.R. § 541.14(a).

None of these broadly worded statutes provide any direct guidance to BOP employees on how to accomplish these objectives. Even if one argues that 28 C.F.R. § 541.14(a) is more specific than 18 U.S.C. § 4042(a), 28 C.F.R. § 541.14(a) does not specify what constitutes a "reasonable belief" that a violation of prison regulations occurred.  In other words, all prison officials have room to make decisions under these statutes.  Therefore, BOP officials have discretion in meeting the goals of the statute, including the goals of prison and prisoner safety.  Montez, 359 F.3d at 395-96.

With no statute, regulation or policy to specifically govern prison safety and/or the keeping of Plaintiff in protective custody, Associate Warden Billisits, Captain Reich, Lieutenant Chiodo, and Unit Manager Kindervater exercised their discretion by deciding to return Plaintiff to the general population on December 19, 2002, but they made this decision based on a thorough investigation.

Mr. Kindervater received a complaint that Eric Drayton pressured Donaldson for sex.  He and Counselor Buck interviewed Donaldson on the same day they received notice Donaldson was in protective custody.  They learned that Donaldson and Drayton had a relationship at a prior federal institution; Drayton wanted it

16

to continue, Donaldson did not.  Drayton was jealous of Donaldson talking to other federal inmates.  Donaldson felt no threat of harm to himself from Drayton but worried about other "suitors."  Donaldson had been approached by other inmates previously, but no harm was threatened or inflicted upon him.  Kindervater also learned from Drayton that he wanted to become Donaldson's cellmate but would never do anything to harm him.  Kindervater also discovered that Donaldson's cellmate witnessed Drayton arguing with Donaldson, but he (Drayton) did not harm Donaldson.  (Ex. 2).

Based on his experience and his investigation, Kindervater found tension between Drayton and Donaldson but no evidence of a threat to Donaldson's safety.  (Ex. 2).  Kindervater recommended Donaldson to be returned to the general population but with some safeguards to keep Drayton away from him.  (Ex. 2, p. 2).  Based on this recommendation and their experience, Lieutenant Chiodo, Captain Reich, and Associate Warden Billisits concurred with the return to general population with conditions.  In fact, Associate Warden Billisits added that both inmates be counseled on inter-unit visits.  (Ex. 2, p. 3).

It is also critical to note that Plaintiff withheld crucial information from Kindervater.  Initially, Donaldson failed to inform Kindervater at McKean, or prison officials at Allenwood for that matter, that he had a prior verbal altercation with Drayton at Allenwood.  (Donaldson, 17, 18).  Additionally,

Donaldson never asked Allenwood officials to separate him from Drayton. (Donaldson, 21). Not more than four (4) months after both were at McKean, Drayton and Donaldson became involved in a second altercation: Drayton grabbed Donaldson's arm and swore at him but inflicted no injuries. Regretfully, this too went unreported, as Donaldson failed to tell officials at McKean. (Donaldson, 22, 23, 25, 41). And most importantly, Donaldson failed to admit to Kindervater or any other prison official at McKean that he had consensual sex on two or three (2 or 3) occasions with Drayton at McKean, prior to the second incident at McKean and well before August 29, 2003. (Donaldson, 23, 24, 52). This withholding by Donaldson clearly hamstrung the efforts of prison officials to learn the true relationship between Drayton and Donaldson and, in part, prevented officials from taking further action with Donaldson and Drayton prior to August 29, 2003.

Contrary to Donaldson's claims, prison officials at McKean decided what they felt was the best course for Donaldson. In the interest of prison safety, and based on many years of experience, Associate Warden Billisits, Captain Reich, Lieutenant Chiodo, and Unit Manager Kindervater exercised their discretion in attempting to keep only those inmates who were in danger in protective custody. Accordingly, the first prong of the discretionary function test is satisfied.

Regarding the second prong of the test, the judgment and choices of Associate Warden Billisits, Captain Reich, Lieutenant Chiodo, and Unit Manager Kindervater are of the kind that the discretionary function exception was designed to shield.  The decisions of all four prison officials were based solely on prison and prisoner safety, which is precisely the type of policy decision that is protected by the discretionary function exception.  See Caudle v. United States of America, No. 95-1620, 1995 WL 730817 at *1-2 (7th Cir. Nov. 17, 1995)(stating that internal prison security is left to the discretion of prison administrators and involves questions of public policy).

Additionally, as the Supreme Court has stated, "when established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324 (emphasis added).  As discussed above, the federal statute and regulations that govern the duties of the Bureau of Prisons, 18 U.S.C. § 4042(a), are broadly worded statutes that implicitly grant discretion to the BOP in determining how to achieve the objectives of the statute, including the objective of prison safety.  Given that the statute provides for the use of discretion, then it must be presumed that the actions of the four prison officials were grounded in policy, thereby meeting the second prong of the test.

19

Furthermore, the Supreme Court has recognized the discretionary nature of prison safety.  In Whitley v. Albers, the Court stated,

> prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security . . . that deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.

Whitley v. Albers, 475 U.S. 312, 321-22 (1986).

Likewise, the Supreme Court has acknowledged that the placement of an inmate is an exercise in judgment, as prison officials must absorb all facts of a given situation and render an evaluation as to the placement of any inmate in their attempt to maintain internal security in a federal prison.  See Rhodes v. Chapman, 452 U.S. 337, 349 n. 14 (1981).  Inmate placement screams for decision-making as balancing the concerns of inmate security with the right of a prisoner to circulate and socialize with some degree of freedom within the general population of a prison is a matter that, without doubt, involves many policy considerations.  Barrett v. United States, 845 F.Supp. 774, 782 (D.Kan. 1994) (though the district court found a mandatory duty to protect inmates, decisions made as to how best to fulfill that duty are protected by the discretionary function exception to the

FTCA); 125 F.Supp.2d 855, 861 (N.D. 111.2000); <u>Cohen v. United States</u>, 151 F.3d 1338, 1344 (11th Cir. 1998); <u>See also Horta v. Sullivan</u>, 4 F.3d 2, 21-22 (1st Cir. 1993) (although law enforcement agents have a mandatory duty to enforce the law, decisions as to how best to fulfill that duty are protected by the discretionary function exception).

It is important to note that courts have uniformly held that as a result of the  discretionary function exception, the United States is not liable under the FTCA for failing to protect a federal inmate from an attack by another prisoner. <u>See</u>, <u>e.g.</u>, <u>Cohen v. United States</u>, 151 F.3d 1338, 1340-45 (11th Cir. 1998), <u>cert</u>. <u>denied</u>, 119 S. Ct. 1803 (1999); <u>Dykstra v. United States Bureau of Prisons</u>, 140 F.3d 791, 795-97 (8th Cir. 1998); <u>Calderon v. United States</u>, 123 F.3d 947, 948-51 (7th Cir. 1997); <u>Green v. United States</u>, 1995 WL 574495 (E.D.Pa. Sept. 22, 1995); <u>Scrima</u>, 1998 WL 661478, at *2-4; <u>Barrett v. United States</u>, 845 F. Supp. 774, 779-82 (D. Kan. 1994).

For example, in <u>Dykstra</u>, the plaintiff had brought suit against the United States under the FTCA, claiming in part that prison officials had negligently failed to protect him from a sexual assault by another inmate.  140 F.3d at 793.  In that case, the plaintiff had been sent to a medical center for federal prisoners for a mental evaluation.  <u>Id</u>. at 794.  A counselor performed the plaintiff's intake interview but allegedly failed to inform the plaintiff that his  youthful appearance might make

21

him vulnerable to assaults by other prisoners if he were not placed in protective custody.  <u>Id</u>.  Rather, the counselor allegedly suggested that the plaintiff waive his option to be placed in protective custody so that the plaintiff would be eligible to work while housed at the medical center.  <u>Id</u>.

Thereafter, the plaintiff claims that another inmate began staring at him, and he reported the staring to a correctional officer.  <u>Id</u>.  This officer allegedly simply informed the plaintiff to report any further problems and did not take any further action.  Subsequently, the inmate sexually assaulted the plaintiff, and as a result, the plaintiff developed post-traumatic stress disorder.  <u>Id</u>.

The plaintiff then filed suit under the FTCA, alleging in part that prison officials had negligently failed to protect him from the assault.  <u>Id</u>. at 793.  The district court, however, dismissed the claim on the ground that it was barred under the FTCA's discretionary function exception.  <u>Id</u>.  On appeal, the Eighth Circuit affirmed.  <u>Id</u>. at 795.

The Circuit Court initially reviewed the Supreme Court's two-part test for determining whether the discretionary function exception applied, <u>i.e.</u>, whether the challenged conduct was the product of "judgment or choice" and is thus discretionary, and whether the judgment was based on considerations of public policy.  <u>Id</u>.  The Circuit Court found that both of these factors

were met, and accordingly, the discretionary function exception barred the plaintiff from recovery.  Id.

In particular, the Circuit Court noted that the plaintiff's FTCA negligence action stemmed from two decisions made by prison officials:  (1) the counselor's alleged decision not to inform the plaintiff that his youthful appearance placed him at risk if he were not placed in protective custody, and (2) the correctional officer's decision not to place the plaintiff in protective custody after the plaintiff reported that another inmate had been staring at him.

With regard to the first allegation, the Eighth Circuit noted that the plaintiff could point to no regulation that required a warning to the plaintiff that his youthful appearance might render him vulnerable to an attack.  Id.  As a result, any decision to provide such a warning would have been discretionary. Id.  Moreover, the court also found policy considerations would have been involved in deciding when to provide such a warning, and as a result, the discretionary function exception to the FTCA was implicated.  Id. at 796.

With respect to the plaintiff's second allegation (that the correctional officer negligently failed to take action when the plaintiff reported that another inmate had been staring at him), the Circuit Court similarly found that there was no regulation that mandated a specific course of action in such a circumstance.

23

<u>Id</u>. at 796.  Rather, the Eighth Circuit noted that applicable federal regulations grant prison officials broad discretion when deciding when to place an inmate in protective custody.  <u>Id</u>. (citing 28 C.F.R. § 541.22(a)).[1]  Indeed, the regulations specifically provide that "[s]taff **may** consider...as protection cases...[i]nmates about whom staff ha[ve a] good reason to believe [are] in serious danger of bodily harm."  <u>Id</u>. (citing 28 C.F.R. § 541.23)).  Thus, by their own terms, the regulations impart discretion to prison officials when deciding what protective measures are appropriate, and thus, the correctional officer had discretion when handling the plaintiff's report.  <u>Id</u>.

Finally, the Circuit Court also found that the correctional officer's decision was of the type that Congress intended to shield from liability under the discretionary function exception. <u>Id</u>.  The Court specifically noted that prison officials' supervision of inmates are based on considerations (such as the availability of resources and other factors) that are inherently

---

[1]    Section 541.22(a) provides as follows:

> The Warden **may**...place an inmate in [protective custody] when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution and when the inmate...[r]equests admission to [protective custody] for the inmate's own protection, or staff determines that admission to...[protective custody] is necessary for the inmate's own protection.

28 C.F.R. § 541.22(a).

grounded in social, political, and economic policy.  Id.  Thus,
the Eighth Circuit stated that it had "no difficulty in
concluding that the discretionary function exception applies to
the correctional officer's decision not to place [the plaintiff]
in protective custody or to take other protective action."  Id.

Similarly, in Cohen, 151 F.3d at 1340-45, the Eleventh
Circuit relied on the discretionary function exception to dismiss
an inmate's claim that had arisen from his assault by another
inmate.  There, the plaintiff claimed that the United States had
negligently assigned his attacker to a minimum security prison.
Id. at 1340.  The Circuit Court, however, held that the
discretionary function exception barred this type of claim
because:  (1) the BOP has ample discretion when classifying
inmates, and (2) deciding how to classify inmates is "part and
parcel of the inherently policy-laden endeavor of maintaining
order and preserving security within our nation's prisons."  Id.
at 1343-44.

In reaching this decision, the Cohen court specifically
rejected the plaintiff's claim that the United States had a non-
discretionary duty to protect him from the other inmate as a
result of 18 U.S.C. § 4042.[2]  Id. at 1342-43.  Rather, the
Eleventh Circuit determined that although § 4042 imposes on the

---

[2]  This statute provides in relevant part that:

> [t]he Bureau of Prisons, under the direction of the
> Attorney General shall...provide for the safekeeping,
> care, and...protection...of all persons charged with
> or convicted of offenses against the Unitd States....

18 U.S.C. § 4042(a)(2) & (3).

BOP a general duty of care to safeguard inmates, the BOP retained
sufficient discretion in the **particular means** that it may use to
fulfill this duty so as to trigger the discretionary function
exception.  Id. at 1342; see also Calderon, 123 F.3d at 950
(stating that "[w]hile it is true that [§ 4042] sets forth a
mandatory duty of care, it does not, however, direct the manner
by which the BOP must fulfill this duty," and therefore, it does
not render the discretionary function exception inapplicable);
Ochran, supra. (Discretionary function exception to the FTCA
applied when a witness was injured by a defendant).  Indeed, in
Calderon, the Seventh Circuit dismissed the case based upon the
discretionary function exception to the FTCA even where the
plaintiff had told staff that his attacker had **threatened him** in
the past.

    Likewise, courts in this district have also applied the
discretionary function exception to the FTCA's waiver of
sovereign immunity.  In Oji v. Weise, Civil Action No. 99-175J
(Judge Smith), an inmate at FCI-Loretto brought an FTCA claim
alleging BOP officials negligently failed to protect him from
another inmate who struck him, on his prison job, in the head
with a cable adapter.  Oji claimed BOP officials had notice of
possible danger from the other inmate but still failed to protect
him and even permitted the plaintiff to work near the other
inmate.  The District Court dismissed the FTCA cause of action by
finding it barred by the discretionary function exception set

forth in 28 U.S.C. § 2680(a).  (Report and Recommendation of
Magistrate Judge Robert C. Mitchell, dated February 24, 2000;
Memorandum Order of Judge D. Brooks Smith, dated March 24, 2000;
Memorandum Order of Judge D. Brooks Smith, dated April 5, 2000,
attached hereto as collective Exhibit 5).

Additionally, though Plaintiff failed to express it in his
Complaint but giving him every benefit, Plaintiff infers that
prison officials should have investigated Drayton until the eve
of his assault on Plaintiff (August 29, 2003).  An investigation,
the inference continues, would have landed Drayton in the SHU,
and Plaintiff's assault would have been prevented.

Yet, decisions by prison officials on initiating
investigations to maintain prison safety are choices also guarded
by the discretionary function test.  The Third Circuit has
stated, "Prosecutorial decisions as to whether, when and against
whom to initiate prosecution are quintessential examples of
governmental discretion in enforcing the criminal law, and,
accordingly, courts have uniformly found them to be immune under
the discretionary function exception."  Pooler v. United States,
787 F.2d 868, 871 (3d Cir. 1986).  It is critical to note that
the discretionary function exception has also been held to apply
to administrative agency decisions on whether or not to bring
enforcement actions.  See Kelly v. United States, 924 F.2d 355,
362 (1st Cir. 1991) (Discretionary function exception applied to

decision of Drug Enforcement Agency officials **not** to investigate allegations of security leaks emanating from the agency) (emphasis added).

Any decisions stemming from an investigation are clearly matters of choice, grounded in discretion and include decisions when to continue and necessarily, end an investigation.  See Gray v. Bell, 712 F.2d 490, 516 (D.C. Cir. 1983) cert. denied, 465 U.S. 1100 (1984); See Payton v. United States, 679 F.2d 475, 481 (5th Cir. 1982).

The prison regulations on incident reports are laced with language concerning the judgment and discretion of prison officials which cuts against Donaldson's "failed-investigation" argument.  In order to file an incident report and initiate the process of sending an inmate to disciplinary segregation, any prison official must have a "reasonable belief" that a prison rule has been violated and must believe informal resolution would not work.  The District Court for the Eastern District of Pennsylvania astutely noted:

> "The decision whether reasonable belief is present and
> whether to institute formal disciplinary procedures
> involves a matrix of policy considerations, such as the
> strength of the prison's concerns for the safety of
> inmates in the context of the particular allegation of
> misconduct, the prison's resources, and the rights of
> the alleged wrongdoer.  Because this decision is guided
> by policy concerns, it is covered by the discretionary
> function exception."  See Green v. United States, 1995
> WL 574495*7 (E.D.Pa. 1995); See, also, Barrett v.
> United States, 845 F.Supp. 774, 779-783 (D. Kan 1994)
> (Inmate's mother sued the United States after her
> inmate son was stabbed to death by another inmate;

> plaintiff alleged negligence for failing to investigate
> death threats reportedly made by the assailant and in
> failing to segregate the assailant from general
> population; though the district court found a mandatory
> duty to protect inmates in general, decisions made as
> to how best to fulfill that duty are protected by the
> discretionary function).

Contrary to Donaldson's "failed investigation" argument, however, Plaintiff received a full and complete investigation. Nine months prior to the August 29, 2003, incident, prison officials sprung into action the same day they received Donaldson's complaint that he could not take Drayton's pressuring any longer by (1) placing him into protective custody and (2) interviewing him to determine if his accusation was valid.  (See Ex. 2).  Further, the officials then interviewed all parties, including Drayton, and determined that Donaldson would be safe in the general population with Drayton, with some additional precautions to ensure his safety.  (Ex. 2).  These administrators and correctional officers determined that grounds did not exist either for the issuance of an incident report against Drayton or to keep Donaldson in protective custody.  Guided by the prison's policy concerns about the issuance of incident reports and the placement of individuals into protective custody, their collective decision to return Defendant to the general population, as in the Green case, is one covered by the discretionary function exception.

Accordingly, Plaintiff's claim that BOP staff acted negligently in protecting him must be dismissed with prejudice, as the Court lacks subject matter jurisdiction over the claim.

## IV.  **CONCLUSION**

For the foregoing reasons, Plaintiff's negligence claim must be dismissed with prejudice, or in the alternative, the Court must grant summary judgment in Defendant's favor and against Plaintiff with regard to these claims.

Respectfully submitted,

MARY BETH BUCHANAN
UNITED STATES ATTORNEY


s/Paul E. Skirtich
PAUL E. SKIRTICH
Assistant U.S. Attorney
Western District of Pennsylvania
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7418
PA ID No. 30440


Dated:  October 6, 2005

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the within Memorandum of Law in Support of Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment was electronically filed and/or served by postage-paid U.S. Mail on this 6th day of October, 2005, to and upon the following:

> Sadrick Donaldson
> Register No. 20102-018
> FCI Allenwood
> P.O. Box 2000, 4-B
> White Deer, PA 17887-2000

> <u>s/Paul E. Skirtich</u>
> PAUL E. SKIRTICH
> Assistant U.S. Attorney