IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

SADRICK DONALDSON                )
      Plaintiff.                 )
                                 )
                                 )
                                 )     CIVIL ACTION NO. 04-257E
      v.                         )     Judge McLaughlin
                                 )     Magistrate Judge Baxter
                                 )
                                 )
UNITED STATES OF AMERICA         )
      Defendant.                 )

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
RESPONSE TO DEFENDANT'S MOTION TO DISMISS,
OR IN THE ALTERNATIVE, MOTION FOR SUMMARY
JUDGEMENT:

AND NOW, comes plaintiff Sadrick Donaldson, pro se and, pursuant
to Rule 12(b) and 56 of the Federal Rules of Civil Procedure,
files the following Memorandum of Law in support of Plaintiff's
Response to defendant's Motion to Dismiss or, Alternatively,
for Summary Judgement.  In Response of it's Motion, Plaintiff
respectfully avers as follows:

## STATEMENT OF FACTS

On or before November 12, 2002, plaintiff Sadrick Donaldson
was harrassed by Eric Drayton and fellow District of Columbia
(D.C.) inmates to engage in sexual conduct with both parties,
plaintiff refused the advance and they continued their harrass-
ment with threats of physical harm if plaintiff did not Comply

to their demand.  On November 12, 2002 plaintiff told Unit
Officer what was taking place.  (Exhibit A.) Buck response to
interrogatories #4 Page 2 (Exhibit F.) Plaintiff Request for
Protective Custody Page 1 and 3 (Exhibit G.) Answers to Plain-
tiff Request for Admission #1 and #4.

At approximately 1:00 pm on November 12, 2002 Two (2)
Officers came to get Plaintiff in his cell and escorted Plain-
tiff to the Lieutenant's Office.  At that time Lieutenant asked
Plaintiff what had happened and Plaintiff responded frankly to
what the situation was.  The Lieutenant repliedthat if Plaintiff
refused to give names of the inmates involved, I Sadrick Donaldson
would not be placed in Segregated Housing Unit (SHU) for Protec-
tive Custody See (Exhibit F.) Request for Protective Custody
Page 1 & 4.  The Plaintiff informed the Lieutenant of inmate
Eric Drayton's name and that of other D.C. inmates involved.  At
that moment in time Plaintiff was placed in SHU for protection
for a verified and specific threat against plaintiff's safety
and security well-being by identified inmates.
(Exhibit F.) Request for Protective Custody Page 1 & 4 (Exhibit
G.) Answer to Plaintiff Request for Admissions #4 and #7.
After being placed in the SHU, Counselor, G. Buck and Unit Manager,
Mr. Kindervator came to interview Plaintiff about the SHU place-
ment, Plaintiff again frankly relayed to the Unit Team the harrass-
ment by Eric Drayton and fellow D.C. Inmates.  See.
(Exhibit F.) Request for Protective Custody Page 1 & 2 (Exhibit A.)
Buck Response to interrogatories #4 (Exhibit G.) Answer's to
Plaintiff's Request for Admissions #4 and #7.

2

Plaintiff elaborated that he feared being injured and possibly killed by inmate Drayton, his fellow D.C. inmates friends and their associates. Plaintiff also told the Unit Team that not only did the harrassment took place on the Prison Compound, but that Eric Drayton would come to Plaintiff Housing Unit. (Exhibit A.) Response to Interrogatories #6 and #9 Exhibit J.) Remedy Response to LaManna and Dodrill Page 1 and 2. Cell-mate, Lester Wilkerson (whom Plaintiff celled with before being placed in SHU) told the Unit Team of the inmates harrassment even before plain-tiff was placed in SHU. All the investigating staff were told of the threat by more than one source, Plaintiff's claims were well verified and well founded as well as known to the staffs. See (Exhibit F.) Plaintiff's Request for Protective Custody Page 2 (Exhibit A.) Buck response to interrogatories #6, 9, and also #10.

While refusing the Compound and still being housed in the SHU on January 5, 2003, Plaintiff was assaulted by another inmate, who threw a cup of disinfectant at Plaintiff. He was found guilty of assault.

See Exhibit (D) Special Investigative Service Report Page 5. While in the SHU the Special Investigative Service (SIS) Lt, and Dr. Rainheart, Psychology Department, both came to talk to me about my placement in the SHU. Plaintiff again told both (SIS) Lieutenant and Dr. Rainheart that Eric Drayton and other D.C. inmates were harrassing Plaintiff.

See Exhibit (F) Plaintiff's Request for Protective Custody Page 1 and 2.

Exhibit (G) Answers to Plaintiff Request for Admission #17.

Plaintiff told Staff specifically that he feared for his life from Eric Drayton.  Plaintiff signed a statement attesting to this effect for the S.I.S. Lieutenant who was handling the Plaintiff's Case.  See.

Exhibit F.) Plaintiff's Request for Protective Custody Page 1 & 2.

Exhibit J.) Remedy Response LaManna and Dodrill Page 1 & 2.

During Plaintiff's SHU stay, two officers placed inmate Eric Drayton in the cell with me and my cell-mate, inmate Jackson, even though inmate Drayton was the reason Plaintiff was there at 1:00 p.m. Plaintiff immediately wrote a request to the Officers about this situation and explained in detailed why inmate Drayton should not be in Plaintiff's cell, especially as Drayton was the reason Plaintiff was in the SHU for Protective Custody.

Exhibit F.) Plaintiff's Request for Protective Custody Page 1.

Exhibit G.) Answer's to Plaintiff's Request For Admission #23.

The next day Officer Winston removed inmate Drayton from Plaintiff's cell after Plaintiff stayed up all night fearing for his life from inmate Drayton (See Exhibit G.) Answer's to Plaintiff Request for Admissions #23.

Plaintiff was told by S.I.S. Lt. That he had spoken to inmate Drayton, and that Drayton promised the Lieutenant that he was not going to harm Plaintiff.  In front of Plaintiff's then cell partner (Eddie Windsand - 007.)  Plaintiff told the S.I.S., Lt. that he feared for his life from inmate Drayton and that he believed he was crazy and would try to harm Plaintiff.  On December 19, 2002, Plaintiff was told by senior Officer Donald Nero to "Pack my Stuff," "you are going to the Compound."  Plaintiff informed

4

Officer Nero that he feared for his life from Eric Drayton and some D.C. inmates and they were harrassing Plaintiff for sex. See Exhibit B.) Incident Report and DHO Report Page 1.

Sometime later inmate Drayton was released from SHU and that very day came to Plaintiff's Housing Unit and again began harrassing Plaintiff. Plaintiff, his cell-partner Michael Windbush and inmate Lester Wilkerson went to the Unit Team and told the staffs that inmate Drayton was harrassing him. See Exhibit A.) Buck Response to Interrogatories #6, 7, 9.

In response to this information, Plaintiff's Counselor G. Buck, had inmates Drayton's picture posted in the Officers Station in an effort to stop him from comming in the Unit. While Officers Dorian, Trann and Super were on duty in the Housing Unit, inmate Drayton continued to enter the Unit and harass Plaintiff. See Exhibit A.) Buck Response to Interrogatories #7, #8. Plaintiff again went to his Counselor, G. Buck, and told him that inmate Drayton was comming to the Unit and harrassing him. As well as during the time of Plaintiff's (SHU) release on February 12, 2003, up to August 29, 2003 other inmates were witnesses to the harassment and many reported it. See Exhibit A.) Buck Response to Interrogatories #6.

The inmates witnesses were Brandon Blanton, Forest Coleman #10368-055, Roger Dawson #11403-007, Howard Smithson #06928-068, and Wayne Higgins #05291-026. All had witnessed the harrassment on numerous occasions. See Exhibit A.) Buck Response to Interrogatories #6.

5

On August 29, 2003 inmate Drayton assaulted Plaintiff in the Education Department by throwing a hot Liquid Chemical mixture in Plaintiff's face.  The mixture contained substance, most of which were Controlled Substance at the institution, or were banned due to their dangerous nature.  In fact, some of it was a "hair relaxer" which the Regional Office had removed from the Commissary because of Chemical ingredients that is/are banned in B.O.P. Institutions.

See Exhibits D.) Special Investigative Services Report Page 1
Exhibit H.) Commissary Order Form F.C.I. McKean Page 1 & 2
Exhibit C.) Plaintiff's BOP Medical Record Page.

Plaintiff suffered Chemical Burns to his Hair, Face, Shoulders and Eyes.  Due to the injuries, Plaintiff is permanently scarred and still has eyes complications.

See Exhibit D.) Special Investigative Services Report Page 8
Exhibit C.) Plaintiff's BOP Medical Records Page 1 through 14.

The responsibility of Plaintiff's assault and injuries is on the BOP employees due to the negligence exercise of their duties as a United States employees.  Plaintiff (and other inmates informed the following and other BOP employees at the Federal Correctional Institution McKean.

(A)   John J. LaManna - Warden

(B)   Mr. Reich - Captain

(C)   Mr. Kindervator - Unit Manager

(D)   Mr. Grim -(A.D.W.)

(E)   Mr. G. Buck - Counselor

(F)   Officer Donald Nero

(G)   S.I.S. Lieutenant Mark Chiodo

(H)  Dr. Rainheart, - Psychology

(I)  Rodney Moore - Case Manager

(J)  Cindy Billisits - (A.W.P.)

The Plaintiff further Assert under oath that Plaintiff was not served with a Court Order granting the Defendant Leave to depose him: To wit:

A party <u>must</u> obtain leave of Court, which shall be granted to the <u>extent consistent with the principles stated in Rule 26 (b)(2)</u>, if the person to be examined is confined in prison or if, without the written stipulation of the parties.

Also, The Deposition on May 5, 2005.  Plaintiff assert under oath that he never signed the Deposition.  And was never served with a copy of Deposition by Defendant.  Exhibit m

(See Objection to the Taking of Deposition also, Notice of Taking Deposition.)

## ARGUMENT

JURISDICTION CLAIMS:

The Jurisdiction claims presented in the defendant's brief which Plaintiff would like to address briefly, the defendant seems to be avoiding the actual issues in this Case before the Court.  The defendant's argument on the subject matter (Jurisdiction) is base-less.  The Plaintiff would not waste his energy nor the precious time of the Court debating about what was already embeded in our Constitutional frame work, which further shows the defendant is not ready to address the real issues in this Case but concentrate

their energy in a frivilous, claim jurisdictional issues that
is baseless before this Honorable Court.   This Case is about
Constitutional Violation.   I hope this would reflect on the Court
record that both parties need to stay within the issues, not
trying to divert other attention to what is not of importance to
this Case nor the Court.

### SUMMARY JUDGEMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), Summary Judgement is
proper if the pleadings, depositions, answers to interrogatories
and admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material fact and
that the moving party is entitled to a judgement as a matter of
Law.   Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548,
2552, 91 L.Ed. 2d 265 (1986).   A non-moving party may not rest
upon mere allegations, general denials, or vague Statements in
opposition to a Summary Judgement Motion.   If the non-moving
party's evidence is merely colorable, or is not significantly
provative, Summary Judgement may be granted.   (See Bixler v.
Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292 (3d.
Cir. 1993) Trap Rock Indius. Inc. v. Local 825, International Union
of Operating Engineers, 982 F.2d 884, 890-91 (3d. Cir. 1992).

It is not the role of the Judge at the Summary Judgement
stage to weigh the evidence or to evaluate it's credibility, but
to determine "whether there is a genuine issue for trial."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct.
2505, 2511, 9 L.Ed 2d 202 (1986).   The Court must draw all

8

inferences in the light most favorable to the non-moving party,
and where the non-moving party's evidence contradicts the movant's,
the Court must accept the non-movant's version as true.   See
Pastore v. Bell Tel. Co. 24 F.3d 508, 512 (3d Cir. 1994).   The
substantive Law governing the dispute will determine which facts
are material, and only disputes over those facts "that might
affect the outcome of the suit under the governing law will pro-
perly preclude the entry of Summary Judgement."   Anderson, 477 U.S.
at 248, 106 S.Ct at 2510.   A genuine issue of material fact for
trial does not exist "unless the party opposing the Motion can
adduce evidence which, when considered in light of that party's
burden of proof at trial could be the basis for a jury finding
in that party's favor."   J.E. Namiye & Sons Inc., v. Fidelity Bank,
813 F.2d 610, 618, (3d Cir. 1987).

## CLAIMS

To prevail on a failure-to-protect Claim, an inmate must first
Satisfy an objective requirement by showing that they are "incar-
cerated under conditions posing a substantial risk of serious
harm."   Farmer, 511 U.S. at 834, 114 S.Ct at 1977.   Then, an
inmate must satisfy a subjective element and show that the Official
"known of and disregards an excessive risk to inmate health or
safety."
"[A]n Eighth Amendment claimant need not show that a prison offi-
cial acted or failed to act believing that harm actually would
befall an inmate, it is enough that the official acted or failed

to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S.Ct at 1981.

An inmate is not required to give advance notice to officials of the risk of harm, and actual knowledge of the risk can be inferred by the trier of fact from circumstantial evidence of the obviousness of the risk. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence .... and a factfinder may conclude that a prison official knew of a substantial risk from the fact that the risk was obvious." I.D. "A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror." Riley v. Jeffes, 777 F.2d 143, 147 (3d. Cir. 1985). If prison supervisors with knowledge of risk of harm failed to take reasonable steps to prevent such harm, they may be liable under this section. Perry v. Walker, E.D. Va. 1984, 586 F.Supp. 1264.

Plaintiff, Sadrick Donaldson various allegations of assaults by inmates, including the foregoing examples, tend to have a mutually reinforcing effect in establishing the possible existence of a risk of harm from such violence. That is, the chronologically earlier instances of assaults may reasonably be considered by a jury as indicating a serious risk which defendants did not act to eliminate. See Riley 777 F.2d at 147 (Permitting pervasive risk to be established by ("much less than proof of a reign of violence and terror").

## THE LAW OF TORT

Legal damage resulting from some injury to the right of another
or from the breach of a duty owing to the other is a necessary
element of a tort cause of action in plaintiff's favor, a wrong
without damages does not constitute a good cause of action.
Whenever there is a wrongful invasion of a clear legal right,
the law infers or presumes damage sufficient to support an action.
In such cases, the injury is regarded as the gist of the action.
A person injured by the commission of a tort is entitled to
pecuniary compensation for the injury he sustained and except
where the circumstances are such as to warrant the allowance of
exemplary damages.

A duty with which the law of torts is concerned is that of
avoiding causing harm to others.  Whenever, by an act that cannot
be justified in law, and that could have been avoided, a person
inflicts an immediate injury on another by force, he is legally
answerable in damages to the party injured.  Therefore, a cause
of action arises whenever one person, by an act not in the exercise
of a lawful right, causes loss or does damage to another with
an intent, either actual or constructive, to produce such harm,
without just or lawful excuse or justifiable cause or occasion.

One who intentionally deprives another of his legally pro-
tected property interest or caused an injury to that interest
is subject to liability to the other if his conduct is generally
culpable and not justifiable under the circumstances.  "Inten-
tional" torts, as distinguished from negligent or reckless torts,
generally require that the actor intended the consequences of

11

the Act, not simply the act itself.  The terms "malice" and
"malicious" are defined not only as relating to the intentional
commission of a wrongful act, but also as involving wickedness,
depravity and evil intent.  Tort liability may depend upon express
malice or similiar subjective criteria, like bad faith, as where
the qualified privileges of action or statement are recognized
as defenses, although generally malicious motive might make a
bad case worse, such motives do not make that wrong that, in it's
essence, is lawful, or as the rule is sometimes stated, a lawful
act does not become a wrong because it is done maliciously.  Even
in some cases, however, a lawful act done soley out of malice and
ill will to injure another may be actionable.  Thus, an action
may lie for written or oral falsehood, not actionable per se nor
even defamatory, where they are maliciously published and are
calculated to produced actual damages.  If the falsehood maliciously
cause the institution of Criminal charges against a party, they
may be actionable.  Similarly, to establish an intentional inter-
ference with a contract, no showing of actual malice is necessary,
rather, a showing of legal malice will suffice.

OBSERVATION:  An injury is willfull where the act that produced
it was intended to have that effect.  Willfulness is sufficiently
established where there is a knowledge that the act will probably
result in an injury to another, and an utter disregard of the
consequences.  The law allows a presumption of willfulness for
certain types of act.  A finding of willful misconduct will be
sustained where it is clear from the facts that the defendant,
whatever his state of mind, has proceeded in disregard of a high

12

degree of danger, whether known to him or apparent to a reason-
able person in his position.

## CONCLUSION

For the foregoing reasons, Defendant's claims must be dismissed
with prejudice, or in the alternative, the Court must grant
Summary Judgement in Plaintiff's favor and against Defendant with
regards to these claims.

Respectfully Submitted,

Sadrick Donaldson, Pro Se
Fed. Reg. No. 20120-018
FCI Allenwood (Medium)
P.O. Box 2000 (4-B)
White Deer, PA. 17887

Dated October 26, 2005

13

## CERTIFICATE OF SERVICE

I, Sadrick Donaldson, hereby certify that a true and correct copy of plaintiff Motion of Memorandum of Law in Support of plaintiff's Response to Defendant's Motion to Dismiss or in the Alternative, Motion for Summary Judgement has been served, by first class postage prepaid placement in the institutional legal mailbox, this 26th day of October, 2005 to:

(1)    Clerk of the Court
       U.S.D.C. For W.D. of PA.
       Fed. Bldg. & U.S. Courthouse
       617 State Street
       Erie, PA. 16501

       And to:

(2)    Paul E. Skirtich
       Asst. U.S. Attorney
       U.S.P.P. 9 Courthouse
       700 Grant Street,
       Suite, 400
       Pittsburgh, PA. 15219

10-26-05

Sadrick Donaldson, Pro Se
Fed. Reg. No. 20120-018
F.C.I. Allenwood (Medium)
P.O. Box 2000 (4-B)
White Deer, PA. 17887